# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BAYER US LLC, | ) | |
| | ) | Case No. 8:22-cv-82 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT AND DEMAND FOR** |
| | ) | **JURY TRIAL** |
| ALTEN, LLC; MEAD CATTLE | ) | |
| COMPANY, LLC; GREEN DISPOSAL | ) | |
| MEAD, LLC; PLATTE RIVER GREEN | ) | |
| FUELS, LLC; and TANNER SHAW, in his | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Bayer US LLC, for its Complaint against the above-named Defendants, states and alleges as follows:

## NATURE OF THE CASE

1.     Plaintiff Bayer US LLC ("Bayer") brings this action seeking indemnification, contribution, and contract and other damages from the parties responsible for both the environmental conditions at the site of the AltEn ethanol plant in Mead, Nebraska and the costs Bayer has been incurring to respond to those conditions and stabilize the site.

2.     Defendants AltEn, LLC ("AltEn"), Mead Cattle Company, LLC ("Mead Cattle"), and Green Disposal Mead, LLC ("Green Disposal") operated at the site of the AltEn plant and worked together as a "closed-loop" system comprising an ethanol plant, cattle feedlot, and bio-char production unit. Defendant Tanner Shaw is the President of AltEn, Mead Cattle, Green Disposal and Platte River, and all are under his direction and control.

3.      In June 2016, Monsanto Company—now an affiliate company of Bayer (collectively referred to as "Bayer")[1] —and AltEn entered into a Renewable Resource Material Agreement that governed the sale of Bayer's treated and untreated seed ("RRM") to AltEn for its use in ethanol production. Under the Agreement, AltEn was obligated to handle and store RRM safely; segregate RRM from other seed whose by-product might be used for livestock feed or agronomic purposes; convert all solid by-products derived from RRM into bio-char; recycle any liquid by-products derived from RRM within the facility; pay Bayer for the RRM; indemnify Bayer; return any unused seed to Bayer; and provide insurance coverage to Bayer as an additional insured under AltEn's liability policies. The Agreement also required AltEn to comply with all applicable environmental laws and regulations and to notify Bayer about environmental incidents and non-compliance at the facility. AltEn was also prohibited from utilizing its relationship with Bayer in promotional or marketing efforts without Bayer's explicit written permission.

4.      AltEn failed to properly handle, store, and otherwise manage the RMM and the by-products from the ethanol manufacturing process in violation of federal and state laws and AltEn's contractual commitments to Bayer. AltEn did not inform Bayer about the numerous notices of non-compliance and violations issued by state regulators. AltEn also failed to pay Bayer for the RRM as AltEn was obligated, and improperly referenced Bayer and/or Monsanto in promotional and marketing efforts without permission.  These and other failures led to the release of untreated thin stillage and manure from a tank at the AltEn plant that flowed onto neighboring properties, the stockpiling of thousands of tons of wet cake by-product, and the mismanagement of millions

---

[1] In June 2018, an indirect and wholly owned subsidiary of Bayer AG merged with Monsanto Company with Monsanto surviving the merger.  At that time, Monsanto became an indirect and wholly owned subsidiary of Bayer AG. Bayer US LLC and Monsanto Company are indirect and wholly-owned subsidiaries of Bayer AG.

of gallons of wastewater in lagoons that were, under AltEn's management, perilously close to failure.

5.      Instead of complying with numerous emergency orders, notices of violations and other directives issued by the Nebraska Department of Environment and Energy ("NDEE") and engaging in remediation efforts,  AltEn and its officers and affiliates – led by Tanner Shaw – have (i) abandoned the site, (ii) sold off their assets to prevent their creditors (including the State and Bayer) from having access to assets necessary to perform remediation and reimburse Bayer for the costs it has incurred to respond at the site, (iii) hindered the response and stabilization efforts performed by Bayer and other seed companies, (iv) refused to undertake or participate in any way in those response and stabilization activities, (v) interfered with Bayer's right to obtain insurance proceeds under AltEn's pollution liability policy and (vi) dissipated assets to avoid any responsibility for the environmental problems that Defendants caused.

6.      At the request of Federal and State authorities, Bayer conducted extensive emergency response stabilization activities at the site beginning in February 2021.

7.      To date, Bayer and other seed companies have spent millions of dollars to stabilize the site and to ensure that the materials abandoned by AltEn were stable and contained so they would not be the source of a potential release from the site. Efforts to date include:

- Reduce water levels in the lagoons below safe operating levels;
- Consolidate and temporarily cover wet cake to eliminate storm water runoff and decrease odor;
- Construct new water storage ponds to hold treated water during the winter weather;
- Treat more than 13 million gallons of contaminated water;
- Develop land-application water-quality standards for treated water;
- Empty and reconstruct the emergency spill basin;
- Remove material from both digesters; and
- Winterize the AltEn physical plant.

3

8.      As a result of Defendants' abandonment of the site, Bayer and other seed companies have also been forced to pay site utility bills and equipment lease payments in order to facilitate their emergency response efforts.

9.      Despite AltEn's contractual obligations to Bayer, AltEn has failed to reimburse Bayer for the costs it is incurring to respond to the conditions at the AltEn facility, and has interfered with its insurance carrier's attempts to investigate and resolve Bayer's coverage claim.

10.     Bayer seeks relief against AltEn, Mead Cattle, Green Disposal, Platte River and potentially other related entities to contribute to the costs they caused, are responsible for, and have thus far willfully avoided and prevented from being paid.

## PARTIES

11.     Plaintiff Bayer US LLC is a Delaware limited liability company with its principal place of business in New Jersey and its sole member is Bayer Corporation which is an Indiana corporation with a principal place of business in New Jersey.

12.     Defendant Tanner Shaw ("Shaw") is an individual who, upon information and belief is domiciled in Kansas.  Shaw is the individual at the center of a complex web of companies related to the AltEn ethanol plant in Mead, Nebraska.  Shaw's relations to the entity defendants are as set out hereinafter.  Until at least 2021, Shaw listed 5225 Renner Road, Lake Quivira, Kansas ("the Quivira Mansion") as his mailing address and that of many of the entity defendants.

13.     Defendant AltEn, LLC is a Kansas limited liability company with its principal office in Shawnee, Kansas. AltEn is registered as a foreign limited liability company in Nebraska. AltEn owned and operated an ethanol manufacturing plant located at 1344 County Rd. 10, Mead, Nebraska 68041 ("AltEn Facility").

14.     Defendant Mead Cattle Company, LLC ("Mead Cattle") is a Nebraska limited liability company. Mead Cattle owned and operated a cattle feedlot located adjacent to the AltEn Facility property at times relevant to this action.

15.     Defendant Green Disposal Mead, LLC is a Nebraska limited liability company. Green Disposal owned and operated a bio-char production unit on the AltEn Facility property.

16.     Defendant Platte River Green Fuels, LLC is a Kansas limited liability company with its principal office last located at the Quivira Mansion address.

## JURISDICTION AND VENUE

17.     This Court has diversity jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1332. The parties are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

18.      Bayer US LLC is a Delaware limited liability company with its principal place of business in New Jersey and its sole member is Bayer Corporation which is an Indiana corporation with a principal place of business in New Jersey. Therefore, Bayer US LLC is a citizen of Indiana and New Jersey for purposes of diversity jurisdiction. Upon review of information publicly available to Bayer US LLC, and as explained in the following paragraphs, none of the named Defendants or their respective members or submembers are citizens of Indiana or New Jersey.

19.     AltEn is a Kansas limited liability company with its principal office last located at the Quivira Mansion, 5225 Renner Road, Shawnee, Kansas 66217.  Upon information and belief, AltEn's known member is Platte River Green Fuels, LLC.  Platte River Green Fuels, LLC's known members are E3 Platte River, LLC, and Falcon Energy, LLC.  E3 Platte River, LLC's known members are Falcon Energy, LLC and E3 Bio Fuels, LLC.  Falcon Energy, LLC is a forfeited Kansas for-profit corporation. E3 Bio Fuels, LLC's known member is Earth, Energy & Environment, LLC.  Earth, Energy & Environment, LLC has two members, Dennis Langley

(deceased) and Langley Group Ltd., a Kansas for-profit corporation.  All of the members and sub-members of AltEn are Kansas entities and share AltEn's principal address, that being the Quivira Mansion. Therefore, upon review of publicly available information, AltEn is a citizen of Kansas for purposes of diversity jurisdiction.

20.     Mead Cattle is a Nebraska limited liability company, with its principal office located at 1344 County Road 10, Mead, Nebraska 68041 (the same as the AltEn Facility).  Upon information and belief, the members and sub-members of Mead Cattle trace back to one or more of the entities and other persons identified in Paragraph 19, and Mead Cattle is therefore a citizen of Kansas for purposes of diversity jurisdiction.

21.     Green Disposal is a Nebraska limited liability company, with its principal office located at 1344 County Road 10, Mead, Nebraska 68041 (the same as the AltEn Facility).  Green Disposal owned and previously operated a bio-char production unit at the AltEn Facility.  Upon information and belief, the members and sub-members of Green Disposal trace back to one or more of the entities and other persons identified in Paragraph 19, and Green Disposal is therefore a citizen of Kansas for purposes of diversity jurisdiction.

22.     Upon information and belief, Tanner Shaw is domiciled in and is a citizen of Kansas for purposes of diversity jurisdiction.

23.     At all relevant times, upon information and belief, AltEn, Mead Cattle, Green Disposal, and Platte River were operated and/or managed by the same persons, among whom were Shaw and his late stepfather, Dennis Langley, both residents of Kansas.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this District, witnesses are located in this District, and other lawsuits concerning similar claims are pending in this District.

## FACTUAL BACKGROUND

**AltEn's Ethanol Manufacturing Facility**

25.    The AltEn Facility in Mead, Nebraska, began ethanol manufacturing operations on or about January 2015, and used grain to produce approximately 24,000,000 gallons of ethanol annually.

26.    Mead Cattle owned and operated a cattle feedlot located immediately adjacent to the AltEn Facility. The operations were designed to function as a "closed-loop" system whereby Mead Cattle would transfer manure to the AltEn Facility, whose two digesters would then convert the manure into methane used to power the ethanol production. AltEn would convey by-product from the ethanol production, known as wet distiller's grain a/k/a wet cake back to Mead Cattle as feed for the cattle.

27.    Green Disposal owned a bio-char unit at the AltEn Facility at all times relevant to this action.  The bio-char unit incinerated wet cake into a charcoal-like material known as bio-char.

28.    The bio-char was stored in large totes made of a flexible, woven fabric called supersacks.

29.    The AltEn Facility and Mead Cattle occupied two adjacent lots and shared several common easements.

30.    The AltEn Facility, Mead Cattle, and Green Disposal shared an entrance onto the property, and the only entry points were on the Mead Cattle lot.

31.    The AltEn Facility and Mead Cattle shared facilities and utilities including a natural gas pipeline.

32.     The AltEn facility received discarded food and other feedstocks and acquired various raw products for its operations, many of which remain on the facility and will require management.

33.     AltEn marketed what it called a "Green Recycling Program" to agricultural companies like Bayer, under which the companies would supply corn, wheat, sorghum, milo seed, and other grains (collectively, "Seed") to AltEn for use in its ethanol manufacturing process. See, e.g., Exh.2, AltEn 2020 email soliciting seed companies' participation.

34.     Bayer, AgReliant Genetics, Beck's Superior Hybrids, Pioneer/Corteva, Syngenta Seeds, and WinField Solutions (collectively, "Seed Companies") were among many companies that sent Seed to the AltEn Facility.

**Bayer's Contracts with AltEn**

35.     In June 2016, Bayer and AltEn entered into the RRM Agreement to sell RRM to AltEn for its use in ethanol production. A copy of the RRM Agreement as amended by two subsequent contract Amendments are attached, and incorporated herein, as Exhibits 1, 1-A and 1-B.

36.     According to the RRM Agreement, acceptance of RRM by AltEn transferred all title, risk of loss and all other incidents of ownership from Bayer to AltEn.  See Exh. 1, RRM ¶ 6.

37.     The 2016 RRM Agreement obligated AltEn to pay Bayer $25 per ton of RRM. See Exh.1, RRM-Exhibit A, ¶ 10. The Amendments to the 2016 RRM Agreement updated the payment amounts and total outstanding owed to Bayer. See Exhs. 1A and 1B.

38.     By entering into the RRM Agreement, AltEn represented and warranted to Bayer that:

a)      AltEn was engaged in the business of using RRM for ethanol production and had "the requisite experience, knowledge and expertise; suitable facilities; qualified personnel; and legal right to utilize the RRM supplied hereunder to produce ethanol;"

b)      AltEn was "in compliance with and, in utilizing RRM, shall remain in compliance all applicable laws, ordinances, orders, rules, regulations and actions of the United States, EPA, NDEQ and any state or political subdivision thereof or other governmental unit or agency…;"

c)      AltEn had obtained, is in compliance with, shall keep in effect, and shall remain in compliance with all permits, licenses and certifications necessary for utilizing RRM for ethanol production as contemplated.

See Exh. 1, RRM ¶ 7.

39.     The RRM Agreement required AltEn to promptly notify Bayer of federal, state, or local warnings, citations, indictments, claims, notices of violations, lawsuits or other proceedings related to AltEn's use of RRM.  See Exh. 1, RRM ¶ 12.

40.     The RRM Agreement obligated AltEn to convert all solid by-products resulting from use of the RRM into bio-char and to recycle all liquid by-products entirely within AltEn's facilities. In no event was AltEn permitted to use any by-products from Bayer RRM for livestock feed or for agronomic purposes. AltEn agreed to handle, store, and process RRM so that it was segregated from seed whose by-products from ethanol manufacturing might be used for livestock feed or agronomic purposes. See Exh. 1, RRM ¶ 8.

41.     The RRM Agreement prohibited AltEn from referring to Bayer or any of Bayer's subsidiaries or use or refer to any of Bayer's trademarks including logos and taglines in any way, including but not limited to promotional and marketing materials or press releases, without prior written permission from Bayer except as necessary to provide services under the Agreement. See Exh. 1, RRM ¶ 9.

42.     Under the RRM Agreement, AltEn was obligated to indemnify Bayer from and against "any and all third-party or direct claims, liabilities, suits, proceedings, judgments, orders, fines, penalties, damages (special, incidental, consequential, or indirect), losses, costs, and

expenses" arising out of or connected with any RRM following delivery, AltEn's and its contractors' activity under or related to the RRM Agreement, negligent acts or omissions by AltEn or its employees or agents, or any failure by AltEn or its employees or agents to comply with the RRM Agreement.  Such covered damages include but are not limited to "damage to or loss or destruction of any property" and "any contamination of, injury or damage to or adverse effect on persons, animals, aquatic or wild life, vegetation, waters, air, land or the environment." See Exh. 1, RRM ¶ 10.

43.    The RRM Agreement also obligated AltEn to include Bayer as an additional insured on several types of insurance policies, including $2 Million worth of Comprehensive General Liability coverage and $1 Million of Excess/Umbrella coverage. See Exh. 1, RRM ¶ 11.

**AltEn's Ethanol Production Practices**

44.    Not long after the AltEn Facility started producing ethanol in 2015, AltEn began storing wet cake in piles at various locations on the AltEn property.

45.    On October 23, 2018, AltEn applied to the Nebraska Department of Agriculture ("NDA") to register its distiller's grain by-product as a soil conditioner, and AltEn received a label for such use.

46.    In the following months, NDA collected samples of AltEn's distiller's grain, and lab analysis showed detectable concentrations of pesticides.

47.    Based in part on the lab results, NDA determined the registered soil conditioner was adulterated and issued a Stop-Use and Stop-Sale Order that prohibited the use of AltEn's distiller's grain (wet cake) as a soil conditioner, and accordingly AltEn cancelled the registration of its distiller's grain as a soil conditioner on August 14, 2019.

48.    AltEn did not inform Bayer about the NDA Stop-Use and Stop-Sale Order.

10

49.     On September 23, 2019, NDEE issued a Notice of Violation ("NOV") to AltEn for waste disposal violations, including operating a solid waste management facility on its property without a permit, and prohibited AltEn from stockpiling the distiller's grain onsite and required disposal of the distiller's grain at a permitted solid waste management facility. After receiving the NOV, AltEn continued to stockpile distiller's grain onsite without submitting a disposal plan or having a solid waste management permit as ordered in the NOV.

50.      AltEn did not inform Bayer about the NOV.

51.     By February 2020, Green Disposal was also facing environmental violations and entered into a Consent Decree with NDEE to allow limited operation and testing of its bio-char unit at the AltEn Facility. NDEE took samples of the material generated by the bio-char unit in March 2021, and test results indicated that the bio-char contained detectable levels of pesticides.

52.     AltEn did not inform Bayer about Green Disposal's environmental violations.

53.     On February 1, 2021, NDEE conducted a site visit and inspected three lagoons (West, Northeast, and Southeast Lagoons) at the AltEn Facility and found that each lagoon was operating in excess of its maximum operating depth and within the area designed for freeboard. NDEE also found that lagoon liners had not been repaired as required by the NOV and were badly damaged.

54.     On February 4, 2021, NDEE issued a Complaint and Order requiring AltEn to immediately cease discharge of industrial wastewater into its wastewater lagoons.

55.     In response to NDEE's Complaint and Order, AltEn shut down the AltEn Facility on February 8, 2021, and stopped its ethanol production.

56.      Bayer visited the Site after the shutdown and determined that AltEn had not been following the contract requirements. AltEn had become lax in meeting specific requirements of its

11

contract, which included segregating the RRM, not using RRM for agronomic purposes, running solid by-products generated from RRM through its bio-char unit, recycling liquid wastewater generated from RRM on site, and informing Bayer of any violations of local, state or federal regulations.

**February 2021 Discharge Event from AltEn Digester**

57.     On February 12, 2021, a frozen valve failure/blowout on one of the two 4-million gallon capacity anaerobic digesters at the AltEn Facility resulted in the release of thin stillage and manure.

58.     The discharge of these materials, which was uncontrolled and unpermitted, flowed onto and off the AltEn Facility property into a drainage ditch and onto neighboring properties located as far as 4.5 miles from the digester tank.

59.     The two 4-million-gallon digesters at the AltEn Facility were designed to produce methane using two inputs: (1) thin stillage from the fermentation process; and (2) manure from the Mead Cattle feedlot.

60.     Mead Cattle's permits provided for expected flows into AltEn's methane digester, and AltEn's operating permits reflect the receipt of substantial flows of manure from Mead Cattle.

61.     The material released in February 2021 was black in color, indicating it likely included manure from Mead Cattle.

62.     Subsequent testing of ten emergency lagoon sludge samples in October 2021 showed the presence of animal by-product residues in AltEn's emergency lagoon. All emergency lagoon samples contained fecal coliform indicating the presence of animal by-product residues, and more than 99% of saturated fat in lagoon samples was from sources other than soil and wet cake.

12

63.     On February 17, 2021, the NDEE issued a letter of non-compliance to AltEn, instructing AltEn to undertake efforts to mitigate and clean up the February 2021 discharge from the AltEn Facility.

64.     On February 20, 2021, after AltEn failed to adequately address the discharge and was otherwise nonresponsive to NDEE's mandates, NDEE issued an Emergency Order and Complaint ("Emergency Order") requiring AltEn's immediate action to mitigate the discharge. The Emergency Order also prohibited AltEn from resuming commercial and industrial operations until the discharge had been sufficiently remediated and would not further threaten or harm public health and the environment.

65.     On March 1, 2021, Nebraska's Attorney General filed a Complaint in State court against AltEn in the District Court of Saunders County, Nebraska, for violating the Emergency Order and for violations of the Nebraska Environmental Protection Act ("NEPA"), the Integrated Solid Waste Management Act ("ISWMA"), and permit conditions.

**Bayer's Response Following the February 2021 Discharge Event**

66.     Following the February 2021 discharge event, NDEE and the United States Environmental Protection Agency ("EPA") engaged with Bayer and other Seed Companies and requested assistance in responding to the environmental conditions at the AltEn Facility.

67.     Due to AltEn's inability and ineptness to respond to the environmental conditions at the AltEn Facility, Bayer contracted with an environmental remediation firm skilled in emergency response, Clean Harbors, to address the digester release.

68.     AltEn staff initially oversaw the effort with input from Bayer personnel consultatively.

69.     Bayer's role expanded to address NDEE's directives to AltEn at the request of EPA and State officials.

13

70.     Initial response efforts focused on drawing down lagoons to safer levels and erecting berms to control storm water runoff from the Site.  Bayer incurred and paid costs in the initial response work in February and March 2021 alone of approximately $1.5 Million.

71.      As Bayer's role grew, it coordinated with other AltEn seed customers to form a coalition known as the AltEn Facility Response Group ("AFRG").

72.     The AFRG signed a Memorandum of Agreement ("MOA") with NDEE under the Nebraska's Voluntary Cleanup Program ("VCP") regarding an interim response and site stabilization measures at the AltEn Facility which the AFRG has been funding to date.  Bayer has incurred millions of dollars in additional costs as part of this work.

**Defendants Abandoned the AltEn Facility, their Cleanup Obligations, and their Contractual Duties to Insure and Indemnify Bayer.**

73.     While Bayer has been engaged in response and stabilization activities at the AltEn site, Defendants have not undertaken any efforts to remediate or stabilize the AltEn Facility.

74.     AltEn began laying off their employees as early as February 2021, and by mid-April 2021, had effectively abandoned the site and its responsibilities.

75.     AltEn made no efforts to properly decommission the ethanol plant and leave the site in a safe and secure state.

76.     AltEn has abandoned large quantities of hazardous chemicals and fuel in multiple tanks and piping within the AltEn Facility. These hazardous chemicals include combustible liquids, acids, and high pH materials that may present aquatic, respiratory, and other hazards.

77.     AltEn has financially abandoned the site, including its debts and obligations to a growing list of vendors, who are now approaching the AFRG to request that the AFRG take over AltEn's outstanding financial responsibilities. Several contractors have refused to perform work at the AltEn Facility due to nonpayment from AltEn.

78.    AltEn was awarded more than $210,000 in COVID-19 relief money by the Nebraska Department of Economic Development in November 2020, just months before it shut down the AltEn facility and financially abandoned the site.

79.    AltEn has failed to maintain the property by leaving storm damage unrepaired and not providing site security, weed control, mowing, or snow removal and remains in violation of certain permit compliance requirements.

80.    AltEn has failed to pay any utility bills and contractors for maintenance of the site, leaving Bayer and the other Seed Companies to pay the gas and electric bills in order to perform the stabilization efforts at the AltEn Facility. The AFRG has also had to assume leases for office buildings and equipment while they stabilize the Site.

81.    AltEn has failed to pay property taxes for the AltEn Facility site, and on or about February 15, 2022, Saunders County issued a Property Tax Distress Warrant to AltEn in the amount of $23,274.20 for tax year 2021.

82.    When Bayer presented its demands for indemnification to AltEn, along with invoices paid for February and March 2021 response expenses totaling approximately $1.5 million (only a portion of the total expenses Bayer has incurred to date), AltEn produced a copy of a pollution liability policy ("PLP") issued by Allied World Assurance Company (U.S.) Inc. ("Allied World") and represented to Bayer that the policy covered the claims.

83.    On March 12, 2021, Bayer sent Allied World a written Notice of Claim and Demand for reimbursement of the approximately $1.5 Million expended on the initial site response efforts following the digester spill.

84.    On October 25, 2021, Bayer learned that AltEn had submitted the Clean Harbor invoices to Allied World as part of its own claim under the PLP, falsely representing that AltEn –

not Bayer –had incurred the expenses. At the same time, it was revealed that AltEn was actively engaged in a campaign designed to block Allied World from reimbursing Bayer on its claim to the insurance proceeds.

85.    Bayer and the other Seed Companies have encountered on-going difficulties in obtaining timely and cooperative assistance from AltEn on administrative duties, including, for example, permit applications/renewals required for stabilization activities.

86.     One example of AltEn's obstruction and malfeasance occurred when AltEn personnel showed up unannounced to dismantle and sell-off parts of the bio-char unit. In that process, a protective silt fence around the bio-char unit that the AFRG installed at NDEE's request, was torn down.

**AltEn's, Mead Cattle's, and Green Disposal's Improper Transfer of Assets**

87.    AltEn and the other Defendants have been, and continue to be, engaged in a systematic transfer of assets that has the effect of, and appears designed to, deprive creditors of access to assets that would be used to make good on the obligations of AltEn and the other entities.

88.    To date, AltEn has not contributed to the costs of stabilization at the AltEn Facility, despite being ordered to do so by NDEE, but on information and belief it has utilized contractors to prepare property and equipment for transfer and disposition.

89.    By June 2021, AltEn had sold more than eighty (80) pieces of equipment and parts used at the AltEn Facility, including semi-trucks, forklifts, stainless-steel piping, and electrical conduit, through BigIron Auctions.

90.    On or about February 14, 2022, AltEn representatives removed additional equipment from the AltEn facility to sell at auction.

91.    AltEn's retention of auction companies, such as BigIron Auctions, to prepare AltEn's assets for auction have added to the burden of site response activities for the Seed

16

Companies. For example, one auction company power-washed equipment that contained treated seed or seed residue without using proper erosion/containment protection, and the wash water flowed into sumps and nearby ditches leading to the emergency lagoon, thereby increasing the volume of wastewater that AltEn has abandoned at the site.

92.    AltEn's and Mead Cattle's contractors have also left a large amount of treated seed on the ground that has been washed off equipment, which itself will need to be managed and will increase the volume of stormwater that requires management.

93.    In the spring of 2021, Mead Cattle sold the feedlot property to Champion Feeders of Texas ("Champion Feeders") for an estimated $22,000,000. Mead Cattle completed this sale over the written objections of Bayer and other Seed Companies.

94.    On May 25, 2021, the Saunders County Board granted a conditional-use permit to Champion Feeders to operate the Mead Cattle feedlot.

95.    On December 27, 2021, the President of AltEn, Tanner Shaw, notified NDEE that a company in Kansas, B. Cole Agriculture, had purchased and agreed to remove the bio-char from the AltEn Facility. The purchaser reportedly intended to apply the bio-char to fields where it grew crops.

96.    On December 30, 2021, NDEE sent a letter to Shaw regarding the proposed disposition of bio-char and labeling Shaw as "President, AltEn, LLC & Green Disposal Mead, LLC."  Additionally, in a letter from Shaw to Thom Buell of NDEE dated November 12, 2021, Shaw signed as "President, AltEn, LLC" and wrote on behalf of Green Disposal Mead, LLC.

97.    AltEn did not disclose to B. Cole Agriculture that bio-char produced from seed-recycling contained pesticides and was prohibited from use for agronomic purposes.

98.     After Nebraska officials learned of the planned transaction, NDEE notified B. Cole Agriculture that the bio-char was not suitable for land application, and B. Cole Agriculture backed out of its deal with AltEn.  AltEn's plan for disposing of the bio-char, if any such plan exists, is now unclear.

99.     There are approximately 1,140 supersacks of bio-char remaining in one of the AltEn Facility's Hoop Buildings.

**Defendants are Liable to Bayer Directly or through the Alter Ego Doctrine.**

100.     The Defendants are primarily owned and operated by Tanner Shaw and share numerous officers and agents.

101.     The organizational structures of the companies owned or controlled by Tanner Shaw are, presumably by design, impossible to determine. There are dozens of AltEn-related entities; all of which frequently change names and places of incorporation, or become inactive.

102.     Upon information and belief, Shaw grossly undercapitalized the Defendants.

103.     Upon information and belief, Shaw diverted funds from the Defendants for his own improper uses.

104.     Upon information and belief, the Defendants are mere facades for the personal dealings of Shaw and their operations are carried on by Shaw in disregard of the corporate entities.

105.     The Defendants are the alter egos of Shaw, and the corporate veil should be pierced and Shaw held personally liable for all of the entities' actions.

106.     Upon information and belief, Shaw exercised his control over the Defendants to commit a fraud against Bayer.

107.     It would be an injustice to Bayer if Shaw and the other Defendants were permitted to perpetrate such a fraud to avoid the material obligations that AltEn committed to Bayer to undertake with respect to the RRM including the payment of significant sums and the management

of the RRM and RRM-related by-products in a safe manner, and Shaw is therefore subject to personal liability for Bayer's damages as alleged herein.

108.    Upon information and belief, Defendants Shaw and Platte River Green Fuels control AltEn to the point that it shows no separate corporate interests of its own.

109.    Upon information and belief, the same, or substantially the same, owners control the Defendants and their management and financing are so commingled that following the corporate form would lead to injustice.

110.    It would be an injustice to Bayer if Defendants were permitted to perpetrate such a fraud to avoid paying Bayer the amounts due and owed to it, and Defendants are therefore subject to liability for Bayer's damages as alleged herein.

## DAMAGES

111.    As a direct and proximate result of the Defendants' actions, Bayer has sustained damages in an amount exceeding $75,000 to be determined at trial.

## COUNT I
## Breach of Contract against AltEn

112.    The foregoing paragraphs are incorporated as if fully stated herein.

113.    In June 2016, AltEn and Bayer had capacity to and did mutually enter into a written contract known as the RRM Agreement, and as amended in 2018 and 2019, provided that Bayer supply RRM to AltEn for purposes of ethanol production and for use in a manner that complies with all applicable laws.

114.    The RRM Agreement provides for ample valid consideration for AltEn's contractual obligations to Bayer pursuant to the RRM Agreement, primarily in the form of Bayer's provision of RRM to AltEn.

115.    Bayer has fully complied with all terms and conditions required under the RRM Agreement and has fully performed all contractual obligations under the Agreement, primarily in the form of providing RRM to AltEn. All conditions precedent, to the extent any exist, have occurred.

116.    AltEn materially breached its contractual obligations to Bayer under the RRM Agreement, including by failing to convert all solid by-products resulting from use of the RRM into bio-char and failing to recycle all liquid by-product within the site. See Exh. 1, RRM ¶ 8.

117.     AltEn materially breached its contractual obligations to Bayer under the RRM Agreement by using RRM-related by-products for livestock feed or for agronomic purposes. See Exh. 1, RRM ¶ 8.

118.    AltEn materially breached its contractual obligations to Bayer under the RRM Agreement by failing to handle, store, and process RRM so that it was segregated from seed whose by-products from ethanol manufacturing may be used for livestock feed or agronomic purposes. See Exh. 1, RRM ¶ 8.

119.    AltEn materially breached its contractual obligations to Bayer under the RRM Agreement by failing to comply with all applicable federal, state, and local laws and by failing to notify Bayer about those violations. See Exh. 1, RRM ¶¶ 7, 12.

120.    AltEn materially breached its contractual obligations to Bayer by failing to remain in compliance with all permits, licenses, and certifications necessary for utilizing RRM, as required in the RRM Agreement. See Exh. 1, RRM ¶ 7(c).

121.    AltEn materially breached its contractual obligations by referring to Bayer in promotional and marketing materials. See Exh. 1, RRM ¶ 9 and Exhibit 2.

20

122.   AltEn materially breached its contractual obligations by failing to pay Bayer for RRM. See Exh.1, RRM-Exhibit A, ¶ 10, and Exhs. 1A and 1B.

123.   Bayer has notified AltEn orally and in writing that AltEn is failing to satisfy its contractual obligations under the RRM Agreement.

124.   Bayer has and will continue to suffer losses, expenses, costs, liability obligations, and damages, all measurable with reference to the RRM Agreement, and all directly and proximately caused by the unlawful and improper acts and material contractual breaches of AltEn, its owners, contractors, officers, employees, representatives and agents in an amount to be determined at trial.   These damages include actual, benefit-of-the-bargain, consequential, and special damages.   Benefit-of-the-bargain damages include but are not necessarily limited to more than $500,000 that AltEn owes Bayer for RRM Bayer provided AltEn pursuant to the RRM Agreement.

## <u>COUNT II</u>
## <u>Breach of Contract – Contractual Indemnity against AltEn</u>

125.   The foregoing paragraphs are incorporated as if fully stated herein.

126.   The RRM Agreement between AltEn and Bayer, described more fully in Count I *supra*, contractually obligates AltEn to indemnify Bayer from and against "any and all third-party or direct claims, liabilities, suits, proceedings, judgments, orders, fines, penalties, damages (special, incidental, consequential, or indirect), losses, costs, and expenses" arising out of or connected with any RRM following delivery, AltEn's and its contractors' activity under or related to the RRM Agreement, negligent acts or omissions by AltEn or its employees or agents, or any failure by AltEn or its employees or agents to comply with the RRM Agreement.   Such covered damages include but are not limited to "damage to or loss or destruction of any property" and "any

21

contamination of, injury or damage to or adverse effect on persons, animals, aquatic or wild life, vegetation, waters, air, land or the environment." See Exh. 1, RMM ¶ 10.

127.   The RRM Agreement provide for ample valid consideration for AltEn's contractual indemnification obligations to Bayer pursuant to the RRM Agreement, primarily in the form of Bayer's provision of RRM to AltEn.

128.   Bayer has fully complied with all terms and conditions required under the RRM Agreement and has fully performed all contractual obligations thereunder, primarily in the form of providing RRM to AltEn. All conditions precedent, to the extent any exist, have occurred.

129.   In March 2021, Bayer confirmed in writing its demand to AltEn to indemnify Bayer for its costs relating to any environmental claims that have arisen, or may arise, with respect to AltEn's operations in Mead, Nebraska. Bayer also requested in writing that AltEn put its insurance carrier on notice of Bayer's claims.

130.   To date, neither AltEn nor its insurance carrier, Allied World, have indemnified Bayer for its expenditures responding to the releases from the digester failure at the site.

131.    AltEn submitted invoices totaling nearly $1.5 million to Allied World for work contracted for and paid for by Bayer and misrepresented that it, not Bayer, had paid for the February and March 2021 expenses.

132.   AltEn materially breached its contractual obligations to Bayer under the RRM Agreement by failing and/or refusing to indemnify Bayer, and by failing to provide insurance coverage as required in the RRM Agreement.

133.   Bayer has notified AltEn in writing that AltEn is failing to satisfy its contractual obligations under the RRM Agreement.

134.     Bayer has and will continue to suffer losses, expenses, costs, liability obligations, and damages, all measurable with reference to the RRM Agreement, and all directly and proximately caused by the unlawful and improper acts and material contractual breaches of AltEn, its owners, contractors, officers, employees, representatives and agents in an amount to be determined at trial.   These damages include actual, benefit-of-the-bargain, consequential, and special damages.   Damages include but are not limited to the nearly $1,500,000 spent for initial emergency response and remediation invoices paid responding to the February discharge event, as well as expenses Bayer incurred beyond March 2021.

### COUNT III
### Declaratory and Injunctive Relief on Voidable Transfers pursuant to the Nebraska Uniform Voidable Transactions Act ("UVTA"), Neb. Rev. Stat. § 36-801 to 36-815

135.     The foregoing paragraphs are incorporated as if fully stated herein.

136.     Bayer is a Creditor of AltEn, Mead Cattle, Green Disposal, and Platte River because Bayer has the legal and/or equitable right to payment from them.

137.     Following the February 2021 discharge event, AltEn ceased operations at the AltEn Facility and sold the majority of its assets.   Mead Cattle sold the majority of its assets at auction and subsequently sold the Mead Cattle feedlot to Champion Feeders of Hereford, Texas for over $22,000,000.   Upon information and belief, Green Disposal similarly is liquidating its assets.

138.     Neither AltEn, Mead Cattle, Green Disposal, nor Platte River, collectively or separately, have dedicated liquid proceeds, or any other funds, to respond to the demands of the NDEE and for remediation of the site.

139.     Upon information and belief, since at least the time of the February 2021 discharge event, Defendants have been constructively insolvent as addressed in Neb. Rev. Stat. § 36-805(a)(2), and are actually insolvent within the meaning of Neb. Rev. Stat. § 36-803.

140.   Upon information and belief, the past and present threatened transfers of assets of AltEn, Mead Cattle, Green Disposal, and Platte River have been made with actual intent to hinder, delay, or defraud Bayer and other creditors.

141.   The transfers were concealed from Bayer and other creditors.

142.   AltEn, Mead Cattle, Green Disposal, and Platte River had been sued or threatened with suit before the transfers were made.

143.   The transfers occurred shortly before or shortly after substantial debts were incurred by AltEn, Mead Cattle, Green Disposal, and Platte River, including without limitation liabilities associated with the February 2021 discharge event.

144.   Upon information and belief, these transfers were made without receiving a reasonably equivalent value in exchange for the transfer at a time when AltEn, Mead Cattle, Green Disposal, and Platte River reasonably should have believed that they would incur debts beyond their ability to pay as they came due, and had unreasonably small remaining assets in relation to the transfer.

145.   Upon information and belief, these transfers were not made in the ordinary course of AltEn's, Mead Cattle's, or Green Disposal's business.

146.   Accordingly, these transfers are voidable as to Bayer under Nebraska statute, and any present or future transfers of like kind will be voidable.

147.   Bayer requests a declaration by this Court of avoidance of all transfers of AltEn's, Mead Cattle's, and Green Disposal's assets following the February 2021 discharge event for less than reasonably equivalent value, including distributions to members of the debtor limited liability companies, pursuant to Neb. Rev. Stat. § 36-808(a)(1).

148.    Bayer further requests a declaration by this Court that any distributions to the members of the debtor limited liability companies or to Shaw following the February 2021 discharge event constitute transfers made with the actual intent to hinder, delay, or defraud creditors of the debtor limited liability companies.  Such distributions include but are not limited to distributions to Defendant Platte River Green Fuels.

149.    An actual, present, and justiciable controversy exists as, upon information and belief, the debtor limited liability companies and Shaw deny that transfers they have made since the February 2021 discharge event are voidable under the Nebraska UVTA.

150.    Bayer lacks information and belief as to the recipients of the voidable transfers but will seek leave to amend this complaint to add them as party defendants, request judgments against such transferees pursuant to Neb. Rev. Stat. § 36-809(b)(1), and seek an injunction against such transferees disposing of transferred assets pursuant to Neb. Rev. Stat. § 36-808(a)(3)(i).

151.    Bayer hereby seeks an injunction against AltEn, Mead Cattle, Green Disposal, and Shaw further transferring and/or disposing of assets, pursuant to Neb. Rev. Stat. § 36-808(a)(3)(i).

### COUNT IV
### Common Law Indemnity against All Defendants

152.    The foregoing paragraphs are incorporated as if fully stated herein.

153.    Bayer has sustained losses, expenses, costs, liability obligations, and damages as a result of the unlawful and improper acts of Defendants and their owners, contractors, officers, employees, representatives and agents.

154.    At the urging of governmental agencies, and in order to prevent irreparable environmental harm, Bayer has incurred expenses to address the February 2021 discharge event and, as part of the AFRG, has incurred expenses to continue necessary work to abate hazards created by AltEn's breach, which in justice Defendants ought to have paid and/or agreed to pay.

25

155.    Bayer is free of wrongdoing and did not in any way cause or contribute to the February 2021 discharge event or the need for the expenditures Bayer has made to address the February 2021 discharge event.  Bayer bears no responsibility for the costs Bayer has expended to respond to the February 2021 discharge event.

156.    Bayer is entitled to indemnification by one or more of the Defendants for the loss, expenses, costs, liability obligations and damages Bayer has sustained, plus any additional damages Bayer may suffer in the future in connection with the February 2021 discharge event.

## COUNT V
## Contribution against All Defendants

157.    The foregoing paragraphs are incorporated as if fully stated herein.

158.    Bayer has sustained losses, expenses, costs, liability obligations, and damages as a result of the unlawful and improper acts of Defendants and their owners, contractors, officers, employees, representatives and agents.

159.    If and to the extent Bayer shares any common liability with Defendants, Bayer has discharged more than its fair share of that common liability in responding to the February 2021 discharge event, benefitting Defendants.

160.    With regard to at least some of the expenses Defendants bore responsibility for, Bayer has paid such expenses in full, extinguishing the liability of Defendants with regard to those expenses.

161.    Bayer is entitled to contribution by one or more of the Defendants for the loss, expenses, costs, liability obligations and damages sustained by Bayer, in an amount to be proven at trial related to sums paid by Bayer to clean up the AltEn Facility site, plus any additional damages Bayer may suffer in the future in connection with this matter.

## COUNT VI
## Equitable Subrogation against All Defendants

162.    The foregoing paragraphs are incorporated as if fully stated herein.

163.    AltEn is responsible for various errors and omissions regarding the construction and design of the AltEn facility.

164.    As a result, Bayer and other Seed Companies have incurred damages in an amount to be proven at trial related to sums incurred to respond to environmental conditions and stabilize the AltEn Facility site. The damages Bayer has incurred and may continue to incur were proximately caused by AltEn, not by Bayer.

165.    In equity and good conscience, Defendants should have paid the expenses Bayer paid to address the February 2021 discharge event.

166.    Bayer is entitled to assert a right of subrogation against one or more of the Defendants in an amount to be proven at trial related to sums paid by Bayer to clean up the site, plus any additional damages Bayer may suffer in the future.

## COUNT VII
## Unjust Enrichment against All Defendants

167.    The foregoing paragraphs are incorporated as if fully stated herein.

168.    Bayer has and continues to incur costs to respond to environmental conditions and stabilize the AltEn Facility site, under a threat of compulsion and government request. This transferred to and conferred a benefit upon Defendants, without adequate legal ground, because Defendants have been able to profit from Bayer's efforts and avoid contributing to cleanup costs.

169.    Defendants are aware of and have retained that benefit.

170.    Bayer's expenses to respond to environmental conditions and stabilize the AltEn Facility site have not benefitted Bayer.

171.    It would be unjust and inequitable for Defendants to retain these benefits without properly compensating Bayer for the costs it has incurred to respond to conditions and stabilize the AltEn Facility site.

172.    In justice and fairness Bayer is entitled to compensation by one or more Defendants for the sums paid by Bayer to respond to conditions and stabilize the AltEn Facility site.

## COUNT VIII
## Fraudulent Misrepresentation against AltEn

173.    The foregoing paragraphs are incorporated as if fully stated herein.

174.    AltEn represented to Bayer, in the RRM Agreement and in AltEn's marketing of its Green Recycling Program, that the AltEn Facility was properly equipped to safely handle RRM and was in compliance with environmental laws and requirements.

175.    AltEn represented to Bayer that it would cooperate with Bayer in pursuing the insurance claim for Bayer's costs in responding to the February 2021 release, inducing Bayer to share its invoices. Alten then used those invoices to fraudulently pursue an insurance reimbursement, representing to its insurance carrier that it had paid the ~ $1.5 Million to Clean Harbors that Bayer in fact had paid.

176.    The above representations were false and fraudulent and AltEn knew the representations to be false or made them recklessly without knowledge of their truth and as positive assertions.

177.    AltEn intended that Bayer would rely on the above representations.

178.    Bayer did rely on AltEn's false and fraudulent representations.

179.    Bayer's reliance on AltEn's representations about the ability of the AltEn facility to handle RRM was reasonable and justifiable.

180.    AltEn's representations about the safety and capabilities of the AltEn facility proximately caused damages to Bayer in the form of expenses Bayer has incurred responding at the site.

## JURY TRIAL DEMAND

Bayer hereby demands a trial by jury for all issues that may be triable by jury in this action.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests relief as follows

a.    Judgment entered in favor of Plaintiff and against Defendants (as applicable to each Count) of Plaintiff's Complaint and an award of compensatory and other damages alleged herein in amounts to be determined by the finder of fact, including future costs Plaintiff may incur associated with the site;

b.    A declaration of this Court that all transfers of AltEn's, Mead Cattle's, Green Disposal's and Platte River's assets following the February 2021 discharge event for less than reasonably equivalent value are void under Nebraska law;

c.    An injunction enjoining and restraining Defendants from further transferring and/or disposing their assets, to avert the likelihood of further injury to Plaintiff during the pendency of this action and to preserve the possibility of effective final relief;

d.    An award of pre-judgment interest, attorney fees, costs and post-judgment interest in favor of Plaintiff and against Defendants;

e.    All further legal and equitable relief as the Court may deem just and proper.

DATED this 2nd day of March, 2022.

BAYER US LLC, Plaintiff

By: s/ Joshua C. Dickinson
        Joshua C. Dickinson, Bar Number 23700
        Attorney for Plaintiff
        Spencer Fane LLP
        13520 California Street, Suite 290
        Omaha, NE 68154
        Telephone: (402) 965-8600
        Fax: (402) 965-8601
        E-mail:  jdickinson@spencerfane.com

        Jane E. Fedder, MO Bar #38228, *will seek pro hac admission*
        Attorney for Plaintiff
        Spencer Fane LLP
        1 N. Brentwood Blvd., Suite 1000
        St. Louis, MO 63105
        (314) 863-7733(Telephone)
        (314) 862-4656 (Facsimile)
        jfedder@spencerfane.com

        Jessica Merrigan, MO Bar #54982, *will seek pro hac admission*
        Paul T. Jacobson, MO Bar #69152, *will seek pro hac admission*
        Attorneys for Plaintiff
        Spencer Fane LLP
        1000 Walnut Street, Suite 1400
        Kansas City, MO 64106
        (816) 474-8100 (Telephone)
        (816) 474-3216 (Facsimile)
        jmerrigan@spencerfane.com
        pjacobson@spencerfane.com